Filed 12/17/20  P. v. Bell CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ASIATAE ROBINETTE BELL,<br><br>    Defendant and Appellant. | D074669<br><br><br>(Super. Ct. No. SCN357154) |

APPEAL from a judgment of the Superior Court of San Diego County, Harry M. Elias, Judge.  Affirmed.

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters and Julie L. Garland, Assistant Attorneys General, Arlene A. Sevidal and Randall D. Einhorn, Deputy Attorneys General for Plaintiff and Respondent.

A jury convicted Asiatae Robinette Bell of second degree murder (Pen. Code,[1] § 187, subd. (a)) and found true allegations that she personally used a

---

[1]    Undesignated statutory references are to the Penal Code.

deadly and dangerous weapon, to wit, a knife (§ 12022, subd. (b)(1)). The court sentenced her to 15 years to life in prison on the murder conviction plus one year on the weapon use enhancement. The court imposed a $10,000 restitution fine (§ 1202.4, subd. (b)), a stayed $10,000 parole revocation fine (§ 1202.45); a $40 court security fee (§ 1465.8), a $30 court facilities assessment (Gov. Code, § 70373) and a $154 criminal justice administration fee (Gov. Code, § 29550).

Bell contends: (1) The court prejudicially erred by instructing the jury with the pattern version of CALCRIM No. 3428 on imperfect self-defense or alternatively, her trial counsel provided ineffective assistance by failing to object to that instruction or request a pinpoint instruction; (2) we should remand this matter for the court to ascertain her eligibility for the section 1001.36 diversionary program based on her mental illness; and (3) the court erred by imposing certain fees, fines, and assessments without ascertaining her ability to pay them under *People v. Dueñas* (2019) 30 Cal.App.5th 1157. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Case*

Bell does not challenge the sufficiency of the evidence to support her conviction; therefore, we present an abbreviated version of the underlying facts. On November 20, 2013, Bell lived in Escondido, California with her father and his wife, M.B., who was not Bell's mother. M.B. was not very mobile or physically active. M.B.'s cousin, R.E., testified that he visited M.B. at her apartment that morning. Bell was not there when he arrived.

Surveillance video evidence from that morning showed Bell went to three different stores inquiring about cellphone prices.

2

M.B. had told R.E. she was afraid of Bell because several times when M.B. awoke from naps, Bell was staring at her. Upon leaving the apartment close to 1:00 p.m., R.E. saw Bell outside.

At 1:20 p.m., Bell telephoned her father and said M.B. appeared to be bleeding. He asked if M.B. was fine, and Bell said, "yes," claiming M.B. was sleeping. Bell did not mention anything about M.B. attacking her or having a knife. Bell's father did not realize M.B.'s condition was urgent; therefore, he left work at 2:00 p.m. for his regular lunch break. When he reached the apartment shortly afterwards, M.B. was covered in blood and unresponsive, and a knife was sticking out of her neck. He immediately called 911.

Paramedics responded to the apartment and pronounced M.B. dead. Investigating police officers saw the apartment's blood-splattered walls. A knife blade broken from its handle was stuck in M.B.'s neck, and a second broken knife blade was found near her. A police officer testified that upon learning M.B. had died, Bell had "a flat emotional response. She was static when we arrived, and I did not see any obvious change of emotion after the paramedics had made the statement that the victim was deceased." Bell never told the police anything about M.B attacking her with a knife or Bell having to defend herself from M.B.

Collected blood samples from Bell's hair and clothing matched M.B.'s blood. Bell's right knuckle was injured, and dried blood was found under one of her left fingernails.

The next day, a police detective asked Bell to write down what had happened to M.B. Bell wrote a note without indicating that she was involved in M.B.'s death or that M.B. had attacked her.

The medical examiner who performed the autopsy testified M.B.'s cause of death was multiple sharp force injuries (a total of 59) from two

3

different knives.  M.B. received 22 stab wounds and 31 incised wounds to her head, neck and chest.  She also had one stab wound on her left arm and five incised wounds on her left arm and hand that were consistent with defensive wounds.  M.B.'s internal and external jugular vein and vertebral artery were severed, leading to excessive bleeding.

*Defense Case*

*Bell's Testimony*

Bell testified that she and M.B. had no arguments in the days leading up to M.B.'s murder.  Bell stated that on the day of the murder, R.E. entered her bedroom and stared at her "with this cold stare."  She heard M.B. yell, "Rape[ he]r."  R.E. replied, "What about [Bell's father]?"  M.B. replied, "Kill him."  Defense counsel asked Bell, "What did you do when you heard that?"  Bell replied, "I was upset because I didn't know what to do at the time.  My dad was at work . . . so I was freaking out because I didn't even have a phone to call him."  She went to several stores looking for an affordable phone but never bought one.  She admitted she did not ask any of the shop attendants to contact 911.

Bell testified that when she returned to the apartment, R.E. was gone.  M.B. asked her if she had overheard the earlier conversation about Bell's father, but Bell denied knowledge of it.  M.B. tried to stab Bell, who pushed her into a chair, and grabbed the knife from M.B.  Bell became scared and remembered stabbing M.B. "like maybe a couple of times," before Bell "blacked out."

In an interview with a detective on the day of the murder, Bell repeatedly denied that M.B. had attacked her.

A forensic neuropsychologist evaluated Bell in June 2017, and without making a formal diagnosis, concluded based on a test that Bell showed

4

symptoms consistent with post-traumatic stress disorder. Bell's test score indicated she possibly exaggerated some of her symptoms. Bell reported taking antipsychotic medications for "auditory and visual hallucinations and she had been prescribed antidepressants." However, Bell had not been taking her medications in the month before the murder.

*Bell's Youth and History of Mental Illness*

Bell testified that she was raped when she was 11 years old, she became pregnant, and had an abortion. Bell was 16 years old when her first child was born. Bell was again raped when she was 18 years old. At age 22, after giving birth to twins, she required reconstructive surgery. Her mental health subsequently deteriorated. She started seeing spirits and hearing voices saying they were going to harm her. Bell was diagnosed with grandiose schizophrenia, and she began taking medication to control the symptoms. She said that over the years she was hospitalized for having suicidal and homicidal thoughts.

Bell stated that in the days before the murder, she did not hear voices or see visions; rather, she was "fine." After the murder, Bell underwent psychiatric evaluation at Patton State Hospital for approximately 16 months and was treated with medication.

DISCUSSION

## I. *CALCRIM NO. 3428 on Mental Impairment as a Defense to a Specific Intent or Mental State for Murder*

Bell contends the trial court instructed the jury with an incomplete version of CALCRIM No. 3428 as follows: "You have heard evidence that the defendant may have suffered from a mental disease, defect or disorder. You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or

mental state required for that crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, *which specifically is malice aforethought.* [¶] If the People have not met this burden, you must find the defendant not guilty of murder." (Italics added.)[2]

Bell contends the court should have followed the CALCRIM No. 3428 use note and inserted the specific "mental state or intent required for each count." Accordingly, she argues that the correct jury instruction should have included the following: "The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically: *express malice aforethought and willful, deliberate, and with premeditation* [*sic*]. If the People have not met this burden, you must find the defendant not guilty of first degree murder. [¶] The People have the burden of proving . . . *specifically implied malice aforethought, that [defendant] knows her conduct endangers the life of another and acts with a conscious disregard for that life or express malice aforethought or an intent to kill.* If the People have not met this burden, you must find the defendant not guilty of second degree murder. [¶] The People have the burden of proving . . . specifically *malice aforethought (express or implied malice) that was not negated by [defendant's] unreasonable self[-]defense.* If the People have not

---

2       This instruction is based on section 28, subdivision (a), which states: "Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored *malice aforethought*, when a specific intent crime is charged." (Italics added.)

met this burden, you must find the defendant not guilty of voluntary manslaughter." (Italics added, some capitalization omitted.) She contends that "[a]n itemized list requires the jury to individually examine how mental illness affects the elements of each crime. That is why the instruction requires such a list and why it was error not to provide it."

Defense counsel did not object to the pattern instruction at trial; however, Bell contends this court must review her claim because the alleged instructional error affected her substantial rights. She further argues her trial counsel provided ineffective assistance by failing to object to the instruction or offer a pinpoint instruction.

We do not need to decide whether Bell forfeited review because we address the claim on the merits to forestall the ineffective assistance of counsel claim. "The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law [citations] and also whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration." (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled." (*People v. Tate* (2010) 49 Cal.4th 635, 696.)

Here, the court accurately instructed the jury with the pattern version of CALCRIM No. 3428 that the evidence of Bell's mental disorder could be considered "for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or mental state required for that crime." Moreover, the court separately instructed the jury regarding the specific mental state required with CALCRIM No. 520 on "first or second degree murder with *malice aforethought*." (Capitalization omitted, italics

7

added.)  The court also instructed the jury with CALCRIM No. 570 on voluntary manslaughter, where malice is presumptively absent when a defendant kills upon a sudden quarrel or heat of passion (§ 192, subd. (a)), provided that the provocation is sufficient to cause an ordinarily reasonable person to act rashly and without deliberation, and from passion rather than judgment.  " '[T]he fact that the necessary elements of a jury charge are to be found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial.' [Citation.]  'The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole.' " (*People v. Burgener* (1986) 41 Cal.3d 505, 538-539, disapproved on other grounds by *People v. Reyes* (1998) 19 Cal.4th 743, 756.)

The court instructed the jury with CALCRIM No. 522 regarding provocation that may reduce a murder from first degree to second degree, and imperfect self-defense.  It also instructed the jurors with CALCRIM No. 627 on "Hallucination: Effect on Premeditation" as follows:  "A hallucination is a perception not based on objective reality.  In other words, a person has a hallucination when the person believes that he or she is seeing or hearing or otherwise perceiving something that is not actually present or happening.  You may consider evidence of hallucinations, if any, in deciding whether the defendant acted with deliberation and premeditation.  Again, the People have the burden of proving beyond a reasonable doubt that the defendant acted with deliberation and premeditation, and if the People have not met this burden, you must find the defendant not guilty of first degree murder."

In sum, the trial court correctly instructed the jury with CALCRIM No. 3428 and based on the other instructions given, if the jury had found Bell did not act with malice aforethought, and found she acted in imperfect self-defense, it would have found her guilty of manslaughter.  [CALCRIM No. 571

8

(Voluntary Manslaughter: Imperfect Self-Defense).]  Additionally, if the jury found she acted in perfect self-defense, it would have acquitted her. [CALCRIM No. 505 (Justifiable Homicide: Self-Defense or Defense of Another).]

We therefore reject Bell's argument that "the trial court effectively instructed the jury not to consider [her] mental disabilities" in deciding whether she had the state of mind "required for second degree murder and imperfect self-defense."  Moreover, her contention is belied by defense counsel's comment on the instruction in closing argument:  "And you can consider the mental disorder, her mental disorder, in determining whether she acted with intent or the required mental state.  [¶]  And that's [CALCRIM No.] 3428, and you'll have that.  And it will explain how you can use her mental state, how you can use her mental disorder.  [¶]  Now there may be some of you right now who start saying, you know:  Self-defense. Yeah, maybe she did have a knife.  Maybe she reasonably believed it.  And yeah, maybe she was in imminent danger and felt the need to use the force, use deadly force.  [¶]  But amongst you, there may be some who are just not sure, who may have thought: You know what? That was unreasonable.  [¶] And if one of you or two of you or somebody is thinking I'm not sure if that's reasonable, there's a jury instruction that tells you what you can do and it's called imperfect self-defense.  And a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed the person because she acted in imperfect self-defense.  [¶]  So what does that mean?  It means she acted in imperfect self-defense if Bell actually believed that she was in imminent danger of being killed or suffering great bodily injury."

In light of the above, it is not reasonably probable the jury would have reached an outcome more favorable to Bell if the jury had been specifically

9

instructed with the modified version of the CALCRIM No. 3428 that Bell proposes.

Bell's reliance on *People v. Townsel* (2016) 63 Cal.4th 25 and *People v. Ocegueda* (2016) 247 Cal.App.4th 1393 is unavailing. *Townsel* involved a modified instruction with CALJIC No. 3.32 regarding intellectual disability evidence with respect to the required intent. The court concluded the instruction erroneously directed the jury to consider such evidence solely to determine whether the defendant formed the intent to kill, or express malice, for the charged murders; however, it precluded the jury from considering such evidence as to the mental state required for the other charged offense of dissuading a witness, and a true finding on a witness-killing special circumstance allegation. (*Townsel*, *supra*, at pp. 57-58, 63-64.) The court explained that the defendant was entitled to have that evidence considered on any *other charge or allegation* besides the murder charges. (*Id*. at pp. 63-64.) Here, there was only one charge—murder; thus, this case is distinguishable from *Townsel*.

In *Ocegueda*, the defendant was charged with attempted murder. The court found the jury was erroneously instructed with CALCRIM No. 3428 that it could consider evidence of the defendant's mental disabilities "only for the limited purpose" of deciding whether defendant harbored the "intent to kill," thereby disallowing consideration of whether he harbored express malice. (*People v. Ocegueda*, *supra*, 247 Cal.App.4th at p. 1407.) The appellate court concluded the trial court improperly "substituted the phrase 'intent to kill' in place of the phrase 'malice aforethought,' the latter of which appears expressly in the pattern instruction. As noted above, these two phrases are not always equivalent." (*Id*. at p. 1408.) Here, the court in its

instruction with CALCRIM No. 3428 properly stated that the mental state required was "malice aforethought."

Because there was no instructional error, Bell's ineffective assistance of counsel claim based on that ground fails.

## II. *Section 1001.36 Claim*

Bell contends she is entitled to a diversion hearing under section 1001.36 because although she was sentenced before that statute went into effect, the Legislature intended the statute to apply to cases pending on appeal. However, she contends that the statute's amendment eliminating diversion for defendants charged with specified crimes, including murder, should not be applied retroactively to her case. We disagree with the latter contention.

The People argue section 1001.36's language demonstrates the Legislature intended the law to operate prospectively, and not to a case like this one that was already adjudicated. The People contend that even assuming section 1001.36's amendments are retroactive, a remand is futile because Bell was convicted of murder and therefore is ineligible for mental health diversion.

Effective June 27, 2018, the Legislature created a pretrial diversion program for defendants suffering from a qualifying mental disorder. (§ 1001.36, subds. (a) & (b)(1).) One of the purposes of the legislation is to promote "[i]ncreased diversion of individuals with mental disorders . . . while protecting public safety." (§ 1001.35, subd. (a).)

Under the statute, a trial court may grant pretrial diversion if all the following eligibility criteria are satisfied: (1) a qualified mental health expert has recently diagnosed the defendant with a qualifying mental disorder; (2) the "mental disorder was a significant factor in the commission of the

11

charged offense"; (3) the defendant's symptoms will respond to treatment; (4) the defendant consents to diversion and waives his or her speedy trial rights; (5) the defendant agrees to comply with treatment; and (6) the defendant will not pose an unreasonable risk of danger to public safety if treated in the community. (§ 1001.36, subd. (b)(1)(A)-(F).)

In September 2018, the Legislature amended section 1001.36, effective January 1, 2019, to eliminate a defendant's eligibility for diversion if the defendant is currently charged with certain offenses, including murder. (§ 1001.36, subd. (b)(2)(A).)

During the pendency of this appeal, the California Supreme Court in *People v. Frahs* (2020) 9 Cal.5th 618 held that section 1001.36 applies retroactively to judgments that are not final and that conditional remand is appropriate to conduct a mental health diversion eligibility hearing. (*Frahs, supra*, at pp. 635, 640.) However, the court declined to address the separate issue of whether the 2019 amendment, which made certain defendants ineligible for the diversion program, also was retroactive. (*Id* at p. 640 ["Nor are we here addressing the separate question of whether the 2019 amendments, which rendered defendants charged with certain crimes categorically ineligible for diversion, apply retroactively."].)

Bell was convicted of second degree murder; therefore, she is statutorily ineligible for mental health diversion under section 1001.36, subd. (b)(2)(A). Bell contends that applying amended section 1001.36 here violates ex post facto and due process protections under the federal and state Constitutions. We disagree. The federal and state ex post facto clauses (U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9) prohibit legislation " 'which makes more burdensome the punishment for a crime, after its commission.' " (*Collins v. Youngblood* (1990) 497 U.S. 37, 42; *People v. McVickers* (1992) 4 Cal.4th 81,

84.) The ex post facto prohibition is intended to ensure that individuals have " 'fair warning' about the effect of criminal statutes [and] 'restricts governmental power by restraining arbitrary and potentially vindictive legislation.' " (*Landgraf v. USI Film Products* (1994) 511 U.S. 244, 267.) We point out that notwithstanding the amendment, the court under the original version of the statute had discretion not to permit diversion if the defendant posed an unreasonable risk of danger to public safety; therefore, as Bell was charged with and convicted of murder, she had no reasonable expectation of diversion even under the unamended statute.

Here, ex post facto concerns do not apply because when Bell committed murder in 2013, she could not have relied on the possibility of receiving pretrial mental health diversion because the law was not yet passed. Moreover, the Legislature's amendment of section 1001.36 to eliminate eligibility for defendants charged with murder did not make an act unlawful that was not formerly unlawful, nor did it increase the punishment for that offense. (See *People v. White* (2017) 2 Cal.5th 349, 360.) Bell was subject to the same punishment when she committed her offense as she was after the Legislature narrowed the scope of defendants eligible for diversion. Thus, amended section 1001.36 does not violate the ex post facto clauses of the state or federal Constitutions. (Accord, *People v. Cawkwell* (2019) 34 Cal.App.5th 1048, 1054, review granted Aug. 14, 2019, No. S256113; app. dism.; *People v. McShane, supra,* 36 Cal.App.5th at p. 260, rev. gr., app. dism.)

### III. *Fees, Fines, and Assessments*

Bell contends the trial court violated her constitutional right to due process by imposing fees, fines and assessments without ascertaining her ability to pay them. She also specifically argues the $10,000 restitution fine

13

imposed under section 1202.4 subdivision (b) is unconstitutionally excessive, and it must be stayed until a hearing is held on her ability to pay.

Bell concedes that defense counsel at the sentencing hearing did not object to the trial court's imposition of the $10,000 restitution fine (§ 1202.4, subd. (b)), a $40 court security fee (§ 1465.8), a $30 court facilities assessment fee (Gov. Code, § 70373), and a $154 criminal justice administration fee (Gov. Code, § 29550), but she contends she did not forfeit this claim because, after her sentencing, the court in *People v. Dueñas*, *supra,* 30 Cal.App.5th 1157 introduced a new constitutional principle. Bell alternatively contends her trial counsel provided ineffective assistance by failing to object to the challenged fees, fines and assessments.

The People contend this claim is forfeited because Bell did not object at the sentencing hearing, and the restitution fine should not be analyzed under due process principles and *Dueñas* but under the Constitution's "Excessive Fines" clause. The People further argue that any error was harmless beyond a reasonable doubt as Bell was 39 years old when the court sentenced her to 16 years in prison and "there is no indication that she has any physical issues precluding her ability to work in prison." They point out that "the only error [the People] concede[ ] with respect to a due process violation in the context of an ability to pay determination is in the imposition of the three non-punitive fees totaling $224."

We conclude Bell forfeited her due process argument by failing to object to imposition of the fines, fees and assessments in the trial court. (See, e.g., *People v. Smith* (2020) 46 Cal.App.5th 375, 395 ["It is well established that a defendant forfeits a challenge to the trial court's imposition of a restitution fine above the statutory minimum for failing to consider his or her ability to pay if the defendant did not object in the trial court"]; *People v. Keene* (2019)

14

43 Cal.App.5th 861, 863-864; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033; *People v. Baker* (2018) 20 Cal.App.5th 711, 720 [claims requiring a fact-specific inquiry are forfeited if not raised below].)

Bell's ineffective assistance claim fails because *Dueñas* did not support an objection to victim restitution, as courts have since held. (See *People v. Evans* (2019) 39 Cal.App.5th 771, 777 ["Based on the significant differences in purpose and effect between victim restitution and the moneys at issue in *Dueñas*, we decline to extend the rule of *Dueñas* to victim restitution"]; accord, *People v. Allen* (2019) 41 Cal.App.5th 312, 326.) Moreover, Bell has not cited any evidence in the record indicating that during her incarceration she will be unable to pay at least some of the $224 imposed as nonpunitive fees. She therefore has not shown that her counsel deficiently overlooked a meritorious challenge. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 432 ["Counsel did not perform deficiently for failing to make what would have been a meritless request"].)

DISPOSITION

The judgment is affirmed.


                                                    O'ROURKE, J.


WE CONCUR:


McCONNELL, P. J.


GUERRERO, J.


16