McGIVEN *vs.* WHEELOCK and PENNIMAN.

W., one of two mortgagors, by an arrangement with P., the other, assumed the payment of the mortgage debt, and thereupon executed a new mortgage upon the same and other premises, to C. the holder of the original mortgage, which new mortgage was given to secure an individual debt of W. and also the balance due upon the joint mortgage. The joint mortgage was not extinguished, but was kept alive as a collateral security to the second mortgage. W. subsequently assigned his property to assignees, for the benefit of his creditors. The assignees advertised the mortgaged premises for sale, and sold it free from incumbrances, M. becoming a purchaser of a portion thereof. By an arrangement between M. and C. and the assignees, the sum due upon the second mortgage was then secured by M. to C., the owner thereof, which security C. received in payment of the new mortgage, and receipted the amount to the assignees. C. then assigned the original mortgage to M. On a bill by M. to foreclose the original mortgage,

*Held*, 1. That the arrangement between M., C. and the assignees, for securing to C. the payment of the second mortgage, amounted to a *payment* and *satisfaction* of that mortgage.

2. That by the payment of the amount due upon the second mortgage, the original mortgage was substantially paid to C. and satisfied, and became *functus officio ;* and that C. had no power to transfer it, as a subsisting security, so as to authorize M., the assignee, to file a bill to foreclose it.

Although equity will sometimes keep alive a mortgage which has been substantially satisfied, yet, whenever this is done, it is. for the advancement of justice, and never to aid in the perpetration of a fraud through the forms of law. *Per* GRIDLEY, J.

IN EQUITY. The bill in this cause was filed to foreclose a mortgage executed by the defendants Wheelock and Penniman, on the 7th of February, 1834, to N. M. Woodruff, to secure the payment of $567,72, with interest. The bill alledged an assignment of the mortgage from Woodruff to John Clarke, executed on the 31st of August, 1839, and an assignment from Clarke to the plaintiff, made on the 8th of March, 1847. The bill was taken as confessed by the defendant Wheelock. Penniman put in an answer, in which he alledged that after the making of the mortgage, and the bond accompanying the same, it was understood and agreed, for a valuable consideration, be-

McGaven *v.* Wheelock.

tween him and Wheelock, that the latter should assume, pay, and discharge the said bond and mortgage in his own behalf and at his own expense; and that in fulfilment of said agreement Wheelock did, on or about the 15th of April, 1843, whilst the said John Clarke held and owned said bond and mortgage, make, execute and deliver to him a mortgage for the sum of about $1565, upon the same premises embraced in the first mortgage, together with other real estate; which mortgage included the amount of principal due upon the original bond and mortgage, whereby such original bond and mortgage were incorporated into and became a part and parcel of the said mortgage from Wheelock to Clarke. That on the 3d of April, 1846, Wheelock made and executed an assignment to L. Paddock and J. L. Goldsmid, of all his property, for the benefit of his creditors. That under and in pursuance of a power contained in that assignment, the assignees, on the 30th of January, 1847, sold and disposed of Wheelock's real estate, or his interest therein embraced in the original mortgage, and also in the mortgage to Clarke; they agreeing and undertaking with the bidders and purchasers, at the time of the sale, to take up and discharge both of said mortgages, so as to relieve the property from those incumbrances. That in pursuance of, and to fulfil, such understanding, the said assignees of Wheelock did, out of the avails of such sale, and of the property of Wheelock so assigned to them, on the 5th of March, 1847, pay to Clarke the amount due upon Wheelock's mortgage to him; and that Clarke, whilst he was yet the owner of, and held, the said bond and mortgage, received and accepted the said money in full payment and satisfaction of that mortgage; whereby, and by virtue of such payment, the defendant Penniman alledged that the mortgage sought to be foreclosed in this suit, became and was fully paid and satisfied; being incorporated as aforesaid in the said mortgage from Wheelock to Clarke, paid as aforesaid. A replication was filed, and proofs were taken, and on the 19th of June, 1848, the cause was referred to a referee to compute the amount due to the plaintiff upon the bond and mortgage, and also to take proofs upon the other matters, questions and

McGiven *v.* Wheelock.

issues raised by the pleadings, and to report the same to the court. The referee returned the proofs taken before him, and reported that he had computed and ascertained the amount due upon the bond and mortgage; and that if the court should adjudge that the plaintiff was entitled to the relief asked for in his bill, and that the amount of such mortgage, and interest, was still due and unpaid, as claimed in the bill of complaint, then he found there was due to the plaintiff, for principal and interest on the bond and mortgage, $547,72. The cause was brought to a hearing upon the report of the referee, and the equities reserved.

*John Clarke,* for the plaintiff.

*G. C. Sherman & F. W. Hubbard,* for the defendant Penniman.

*By the Court,* GRIDLEY, J. We think that the bill in this cause should be dismissed, upon grounds which we will proceed to state with as much brevity as possible.

I. We are of the opinion that the inference may be justly drawn from the acts of Wheelock, and his agreement with Mr. Clarke, that as between him and Penniman, he had assumed to pay the debt which the mortgage in question was executed to secure.

(1.) The debt was, when contracted, due from the defendants jointly, and though payable in one year, was suffered to remain unpaid until the 15th of April, 1843. At that time Wheelock did in fact assume the satisfaction of the debt, upon himself, and on that day executed a bond and mortgage for $1565 to Mr. Clarke, who was then the holder and owner of the mortgage in question, to secure an individual debt of Wheelock, and also the balance that remained due on the joint bond and mortgage of Penniman and Wheelock. Why did Wheelock do this, unless, by some arrangement with Penniman, he had assumed the joint debt? If he had paid it up in money, it would excite less surprise; but why should he mingle it with his own indi-

McGiven *v.* Wheelock.

vidual liabilities, and incumber his individual property to secure the payment at a future day, unless he had assumed it as his own? There is no evidence that Clarke was pressing for payment or further security, or that the premises were not an ample fund to secure the balance then due; or that Penniman was not then and since perfectly responsible. The *actual* assumption of this debt *as an individual liability*, and the giving of a new security for it by Wheelock, unexplained, certainly furnishes a very strong presumption that he thus assumed this debt because he had agreed with Penniman to do so.

(2.) The mortgage in question was not *extinguished;* for Mr. Clarke, as a prudent man, was unwilling to relinquish any security which he possessed. But it was kept *alive solely as a collateral security* for the amount of the balance then due upon it, to the same amount secured by the new $1565 mortgage. The important point in this transaction is, that the new bond and mortgage became, by the agreement between Wheelock and Clarke, the *principal debt*, and the old bond and mortgage, that is, the joint obligation of Penniman and Wheelock, a *collateral security only*. In other words, the *individual obligation* of Wheelock was substituted as the *principal debt*, and the *joint obligation* of Penniman and Wheelock took the place of a *mere surety fund*. That I am right in the conclusion, that the joint mortgage was merely kept alive as a collateral security until the mortgage for $1565 was paid, I refer to the statement of this fact contained in schedule A. annexed to Wheelock's general assignment; to the admissions in folio 8th, that Mr. Clarke drafted and witnessed the said assignment and schedule; and to the testimony of Mr. Clarke in folio 26 of the evidence, when he testifies unequivocally to the fact. Now, it is entirely clear, that the object sought, by including the debt secured by the old mortgage, in the new one, was not to *increase the security merely*, for *that* would have been effected by retaining the old joint mortgage as the *principal debt*, and making the new one collateral to it *pro tanto*. But the object must have been that Wheelock should assume the joint debt as his individual obligation, and secure it with his own separate

property. In the absence of any explanation, we are brought to this inevitable conclusion. The question then recurs *why* he should do this, unless it had been agreed between him and his partner Penniman, that he should assume this debt? (3.) On the third day of April, 1846, Wheelock having become utterly insolvent, assigned all his property, real and personal, in law and in equity, to be applied to the payment of his debts, giving certain preferences, for the reason, as stated in the assignment, that his property was insufficient to pay all his creditors. Under these circumstances, he makes the $1565 debt a preferred demand. Why should he thus devote his individual property (over and above that bound by the mortgage) to the payment of that portion which represented the joint debt, postponing and sacrificing many of his individual creditors, unless it had become *his own separate debt?* Would he have volunteered his own property to pay off Penniman's portion of the debt, unless he had agreed with Penniman so to do? Would he not have called upon Penniman to contribute his portion of the joint debt, and thus relieve his broken fortune from the pressure of this copartnership demand? Again; while he was making provision for the payment of this entire $1565 demand as a preferred debt, if it was true that he was paying the half of this original joint debt for and on behalf of Penniman, (and not on account of a consideration theretofore received from Penniman,) he would lay the foundation for a just claim against Penniman for the one-half the amount advanced. And whether this claim existed as an interest in the mortgage, by way of an equitable substitution, or in a demand for money paid, it passed by the general assignment to his assignees. And the question then arises, why it is not found in the inventory of his property assigned? He could not have forgotten such a claim as this; and it is therefore reasonable to conclude that he had no such claim. How then can we escape the conclusion that he paid this joint debt because he had long since agreed to do so, and had received the consideration for so doing? But

II. We think that the mortgage has been substantially paid and satisfied; and that Mr. Clarke had no power to transfer it

as a *subsisting security*, to the complainant. We have already seen that after the execution of the $1565 mortgage, it *survived only as a collateral security*, to an equal amount of that mortgage which had been substituted for it and in which the joint debt had been merged. When therefor the $1565 mortgage was satisfied, the mortgage in question being collateral to it, became *functus officio*. Wheelock's real estate, which was bound by the $1565 mortgage, was advertised and sold by the assignees, *free from incumbrance.* The complainant became the purchaser of a part of it, and a Mr. Hawkes of another portion. The assignees were bound, therefore, to remove all incumbrances, and to convey the premises to the complainant unincumbered by the $1565 mortgage. They desired, therefore, to pay off Mr. Clarke ; and they were to receive the money to make this payment from the complainant as a part of his bid for the property. But it was arranged, by McGiven paying, or rather securing, to Mr. Clarke, the sum due upon this mortgage then amounting with interest, to $1783, which Mr. Clark received in payment of his mortgage, *and receipted the amount to the assignees.* The assignees, being the owners of the fee of this land, subject to the $1565 mortgage, having contracted to sell it free from incumbrance, insisted on paying up and satisfying that security. This would be done directly by their paying Clarke the $1783, thus removing the lien of the mortgage, and McGiven paying it to the assignees as the purchase price of the premises. Instead of this direct mode, however, McGiven undertakes to satisfy the mortgage to Clarke, and Clarke to receipt the money to the assignees. This is, for all the purposes of this suit, *a payment of the $1565 mortgage.* It is true that Mr. Clarke recites, in his receipt, that as *between him and McGiven,* he holds the old mortgage (for $1565) as security for so much of the new mortgage which McGiven had given him. But he could in no event hold it as against *any one but McGiven.* It was kept alive only to *strengthen* the new mortgage which McGiven had given him. What then was the condition of the old joint mortgage? *That* was held by Clarke not as a separate and independent security. It se-

cured a *part* of the debt for which the $1565 mortgage had been given, and was held, solely, as collateral to it. It could not be assigned to any third person, by Clarke, to be collected as an independent security. It could only be resorted to, to supply any deficiency that might remain after exhausting the $1565 bond and mortgage. It follows, that if that mortgage was *substantially paid to Clarke*, then the mortgage in question has ceased to be a subsisting security, and is satisfied. But suppose the $1565 mortgage was *not* technically, and for all purposes, *functus officio*. It was satisfied by Clarke's own showing, except as between Clark and McGiven; and he was entitled to hold it only *against McGiven*, and as *collateral to McGiven's new mortgage*, Clarke could only enforce the $1565 mortgage for that single purpose; and he could hold the joint mortgage and enforce it only as collateral to the $1565 mortgage. He had no power, therefore, to assign it to McGiven, to be collected for his benefit. He could no more do that than he could collect the $1565 mortgage and the joint mortgage also, and put the proceeds of both in his pocket. One of the assignees swears that this suit is not prosecuted for their benefit. And Clarke testifies that so far as he knows, it is prosecuted for McGiven's benefit. What right has McGiven to the proceeds of this mortgage? He has got the premises he bought of the assignees, unincumbered, and he has secured to Clarke precisely what he was to pay upon his bid, to the assignees. The simple truth is that Mr. Clarke has assumed to make a *gift* of this mortgage to the complainant. He derives all his right from Clarke, and he can not collect this mortgage and put the money in his pocket, unless Clarke could himself have done so.

The pretence upon which this most inequitable proceeding is attempted to be upheld and defended is, that Penniman has never paid his part of the mortgage debt, and that he ought to pay it. I have already advanced some reasons why we are at liberty to infer that Wheelock paid that debt, because some arrangement existed between him and Penniman, by which he had assumed it as his own. But suppose we are mistaken in that conclusion. Who now owns the claim against Penniman?

McGiven *v*. Wheelock.

Whether it exists in the form of an equitable interest in the mortgage, or in the form of a demand for money paid (or secured, so as in equity to amount to a payment,) in his behalf? Every such claim or demand, legal or equitable, which existed in favor of Wheelock passed by the assignment, to the assignees. They alone, therefore, can enforce it. It belongs to Wheelock's creditors. Mr. Clarke, (who is otherwise amply secured,) can not appropriate it. Nor can he give it away to McGiven. Nor can McGiven collect it in his own name for the benefit of Wheelock, in fraud of Wheelock's creditors, as there is too much reason to believe is the real object of this suit. It is true that equity will sometimes keep alive a mortgage which has been substantially satisfied ; but it is always for the advancement of justice, and never to aid in the perpetration of a fraud, through the forms of law. Mr. Clarke had no equitable right to enforce this mortgage as a security independently of the mortgage given for the $1565, which the assignees paid up, so far as they were concerned, and so far as to relieve the mortgage now in suit, from any claim Mr. Clarke had to it as collateral to the one paid by the assignees. If, then, Wheelock had any equitable interest in the mortgage against Penniman, by reason of his paying or securing Penniman's share, the assignees succeeded to that right ; and having paid off the $1565 mortgage, so as to extinguish it, *as between them and Clarke*, by the very terms of Clarke's receipt, they were entitled to have the joint mortgage (which Clarke only held as collateral to the other) delivered over to them on the payment of that other. Clarke, then, could not assign it to McGiven, and McGiven having no interest in it, can not equitably enforce it. This is the most favorable view of the case for the complainant. The better opinion is, as we think, that the mortgage which this suit is brought to foreclose, has ceased to exist as a subsisting security, and that the assignment of it by Clarke was a nullity. And if any claim exists against Penniman at all, it is a claim to be enforced by the assignees, on the ground of the satisfaction of a debt by Wheelock, only half of which he was bound to pay ; in other words, a suit for contribution. To allow the complainant to

succeed in this foreclosure would enable him to perpetrate a fraud upon Penniman, or upon the assignees of Wheelock. And in either case such a result would be a reproach to the administration of justice.

The complainant's bill must be dismissed, with costs.

Decree accordingly.

