**Gregory Warren BEAVER, Petitioner–Appellant,**

v.

**Charles E. THOMPSON, Warden, Respondent–Appellee.**

No. 95–4003.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 27, 1995.

Decided Aug. 22, 1996.

---

* As to Panel Rehearing Only.

**ARGUED:** Christopher Martin McMurray, Kirkpatrick & Lockhart, Washington, D.C., for Appellant. Robert Quentin Harris, Assistant Attorney General, Office of the Attorney General, Richmond, Virginia, for Appellee. **ON BRIEF:** Susan M. Casey, Kirkpatrick & Lockhart, Washington, D.C., for Appellant. James S. Gilmore, III, Attorney General of Virginia, Office of the Attorney General, Richmond, Virginia, for Appellee.

Before WIDENER, HALL, and LUTTIG, Circuit Judges.

Affirmed by published opinion. Judge WIDENER wrote the majority opinion, in which Judge LUTTIG joined. Judge HALL wrote a dissenting opinion.

## OPINION

WIDENER, Circuit Judge:

Gregory Warren Beaver appeals the district court's denial of a writ of habeas corpus for his claims of conflict of interest of one of his attorneys and also otherwise ineffective assistance of counsel which includes a claim of an invalid guilty plea. He also asserts that the district court erred in denying him an evidentiary hearing and that Virginia's capital murder statute is unconstitutional. We affirm.

### I.

On April 12, 1985, Beaver shot and killed Trooper Leo Whitt of the Virginia State Police during a traffic stop on Interstate 95 in Prince George County. A hitchhiker riding in the car with Beaver testified that Trooper Whitt requested Beaver's license and registration. Beaver instructed the hitchhiker to look in the glove compartment for the documents and Trooper Whitt moved to the front of the car and appeared to write down the number of a license plate displayed in the front windshield. As the officer returned to the driver's side window, the hitchhiker informed Beaver that he could not find the license or registration. Beaver raised a gun and shot Trooper Whitt once and then, as the trooper struggled for his own gun, a second time, causing the officer to fall to the ground. Beaver drove away and continued north on Interstate 95 until he exited onto a side road. Beaver stopped at a fast food restaurant near Richmond to change the license tags. He followed the hitchhiker into the restaurant and went into the restroom. Pretending to place an order, the hitchhiker told a restaurant employee to call the police because the man he was with had shot a state trooper.

Beaver was charged and convicted of capital murder for the willful, deliberate, and premeditated killing of a law enforcement officer for the purpose of interfering with his official duties, and the use of a firearm in commission of a felony in violation of Va. Code §§ 18.2–31(f) and 53.1. He was sentenced to death for capital murder. The court appointed John Maclin, IV to represent Beaver. Maclin asked the court to appoint T.O. Rainey, III to assist him, he and Rainey having worked together in the defense of a capital case previously. In addition to his private law practice, Rainey served as a part-time assistant prosecutor in neighboring Dinwiddie County.[1]

---

1. Some months after the trial Rainey became the Commonwealth's Attorney for Dinwiddie County,     also a part-time job.

The case came to trial on July 8, 1985 and a jury was selected. On July 9, 1985 Beaver changed his plea to guilty on both charges according to a written plea agreement. Following a sentencing hearing starting on July 9 and continuing on September 16, 1985, the trial court found beyond a reasonable doubt that there was "a probability that Beaver would commit criminal acts of violence that would constitute a continu*ance* [sp] and serious threat to society." See Va.Code § 19.2-264.2. Maclin and Rainey represented Beaver on direct appeal to the Supreme Court of Virginia which affirmed his conviction and sentence, and the Supreme Court of the United States denied certiorari. *Beaver v. Commonwealth,* 232 Va. 521, 352 S.E.2d 342, *cert. denied,* 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 781 (1987).

With the aid of different court-appointed counsel, Beaver filed a petition for a writ of habeas corpus in the Circuit Court of Prince George County. That court found that the record of the trial proceedings conclusively established that the plea was voluntarily and intelligently made with a full understanding of the consequences of the plea and also that habeas relief should be denied under the rule of *Anderson v. Warden,* 222 Va. 511, 281

S.E.2d 885 (1981).[2] The court also found that the claim that the Commonwealth breached the plea agreement was barred because Beaver had not raised this issue at trial or on direct appeal. In all, the state court denied or dismissed ten of Beaver's twelve claims and scheduled an evidentiary hearing to address the remaining claims of ineffective assistance of counsel and conflict of interest. Following a two day evidentiary hearing on May 23, 1991 and September 11, 1991, the court adopted the factual findings as presented by the Commonwealth and denied these claims as well. *Beaver v. Thompson,* No. 88–13–H.C., Cir. Ct. of Prince George Co., Sept. 10, 1992. Beaver appealed to the Supreme Court of Virginia which affirmed, and the Supreme Court of the United States denied certiorari. *Beaver v. Thompson,* Record No. 921832 (Mar. 9, 1993), *cert. denied,* 510 U.S. 879, 114 S.Ct. 219, 126 L.Ed.2d 175 (1993). Having exhausted state remedies, Beaver filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Virginia on March 3, 1994.[3] The district court denied Beaver's request for an evidentiary hearing, dismissed the habeas claims, and denied his motion for reconsideration. *Beaver v. Thompson,* C.A. No. 3:94CV149 (E.D.Va. Nov. 25, 1994; Jan. 13, 1995). Beaver then filed this appeal.

---

**2.** In *Anderson,* the court denied a habeas petition based on a claim of involuntary guilty plea due to ineffective assistance of counsel because the allegations and proof in the petition were contrary to the petitioner's representations at trial that the plea was knowing and voluntary. No sufficient reason to impeach the trial proceeding was given.

**3.** Beaver raised the following issues in his federal district court habeas petition:

Claim I: Counsel's conflict of interest mandates habeas corpus relief.

Claim II: Beaver's guilty plea was not knowingly or intelligently made.

Claim III: In the alternative, the Commonwealth breached the plea agreement with Beaver [which was ambiguous as a matter of law].

Claim IV: Counsel were ineffective in representing Beaver in connection with the guilty plea and at the sentencing hearing and on direct appeal and Beaver was thereby prejudiced.

Claim V: Beaver was denied effective psychiatric assistance in preparation of his defense.

Claim VI: Pre-trial publicity so infected the trial as to deprive Beaver of an impartial jury and due process of law.

Claim VII: The court's failure to strike for cause jurors who could not be impartial prejudiced Beaver's right to an impartial jury.

Claim VIII: The Virginia Supreme Court's proportionality review was so inadequate and superficial as to deprive Beaver of his right to an adequate and meaningful review.

Claim IX: The trial court erred in admitting at the sentencing phase unreliable evidence of alleged crimes for which Beaver had neither been tried nor convicted.

Claim X: Virginia's capital murder statute and sentencing procedures are unconstitutional facially and as applied, under the Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States.

Claim XI: The circuit court failed to consider adequately all mitigating circumstances and the evidence did not support a finding of future dangerousness beyond a reasonable doubt.

## II.

Beaver raises the following issues on appeal: (1) he was deprived of his constitutional right to an attorney free from disqualifying conflict of interest, (2) his guilty plea was not knowingly and voluntarily made and resulted from ineffective assistance of counsel, (3) his counsel were ineffective in failing to investigate and present vital evidence about his background and in their handling of psychiatric evidence, (4) the district court erred in failing to hold an evidentiary hearing, and (5) the Virginia capital murder statute is unconstitutional. Our review of matters of law in the district court's decision is *de novo.*

Our decision here will review applicable questions under the law and standards as they existed or may exist without reference to the Anti-terrorism and Effective Death Penalty Act of 1996, P.L. 104–132, April 24, 1996. Our reason for adopting such a standard of review is that all provisions of that Act either under Title I, Habeas Corpus Reform or Chapter 154, Special Habeas Corpus Procedures in Capital Cases, which could have any effect on the case at hand are at least as favorable to the Commonwealth and less favorable to the prisoner than the existing law under which we will decide this case. Because Beaver takes the position that the Anti-terrorism Act should not be applied, we will give him the benefit of the doubt and, without deciding the question, assume that it does not for the purpose of this decision.

## III.

We address first Beaver's claim that the district court erred in denying his request for an evidentiary hearing. We have held that a new evidentiary hearing should be held on a habeas petition only when the petitioner (1) alleges additional facts that, if true, would entitle him to relief, and (2) establishes any one of the six factors set out by the Court in *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)(overruled in part by *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992)), or one of the factors provided in 28 U.S.C. § 2254(d).[4] *Poyner v. Murray,* 964 F.2d 1404 (4th Cir.), *cert. denied,* 506 U.S. 958, 113 S.Ct. 419, 121 L.Ed.2d 342 (1992). *Keeney* overruled the *Townsend* requirement for a hearing in a case (absent deliberate bypass) where the material facts were not adequately developed in the state court, and held that a federal habeas petitioner must show cause and prejudice to excuse failure to develop material facts in state court proceedings.

Even now Beaver does not spell out any right to a hearing under the factors mentioned in *Townsend,* 372 U.S. at 313–18, 83 S.Ct. at 757–60, or the factors mentioned in § 2254(d). Rather, he claims generally that the state habeas proceedings were not full and fair because "Beaver's habeas counsel were not permitted to depose [in pre-trial depositions] Beaver's trial counsel, especially

**4.** Prior to the April 24, 1996 Act which moved § 2254(d) to § 2254(e) and deleted the exceptions to the presumption of correctness of state court findings of fact, 28 U.S.C. § 2254(d) stated:

> In any proceeding instituted in a Federal Court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court ... [and] evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—
> (1) that the merits of the factual dispute were not resolved in the State court hearing;
> (2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;
> (3) that the material facts were not adequately developed at the State court hearing;

> (4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;
> (5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;
> (6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or
> (7) that the applicant was otherwise denied due process of law in the State court proceeding;
> (8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record.

Rainey;" and the state court "limited the testimony of two of Beaver's expert witnesses and did not permit at all the testimony of the expert on conflict of interest." Brief p. 49.

The record discloses that Beaver was permitted to file interrogatories to his trial attorneys in the state habeas proceedings. While he describes such interrogatories as "limited," any limitations which were placed upon them he does not disclose. Also, although Beaver now complains in a reply brief that he was not permitted to discover by deposition of Rainey the percentage of the criminal cases in the county handled by Rainey, an examination of the record does not disclose that he asked these questions of Rainey when Rainey testified in the state habeas proceeding. In all events, the record shows that at the time of the trial, Rainey's participation in the criminal courts of Dinwiddie County was very minimal, some 2–5%, other than brief writing on appeals.

We also note that Beaver in his brief does not identify by name of witness or content the expert witnesses' testimony he now complains was limited or not permitted, but we have nevertheless examined the testimony of Dewey G. Cornell, a forensic psychologist and Craig S. Cooley and David Boone, attorneys, who are all of the expert witnesses who testified on behalf of Beaver in the state habeas hearing. We have also examined the transcript of the state habeas hearing with respect to the offered testimony of one David Rosenberg, an expert on legal ethics, who would have been called upon to testify that in his opinion Rainey's employment as a part-time Commonwealth's attorney for Dinwiddie County was a breach of legal ethics. Such opinion would have been offered as evidence which tended to support the sought-for conclusion that Rainey had an unconstitutional conflict of interest. The state court did not permit that testimony on the ground that it did not need the assistance of an expert in determining the issue. Even if this were a

direct appeal, we do not think that ruling would be an abuse of discretion.

We find no fundamental error at all in the rulings on evidence in the state habeas proceeding, much less error of such constitutional dimension that it should affect this collateral proceeding. Cf. *Grundler v. North Carolina*, 283 F.2d 798, 802 (4th Cir.1960).

The hearing in the state habeas court lasted the better part of two days. The witnesses called by Beaver included his father, grandmother, uncle, ex-wife, mother, and a half-sister. He also called a forensic psychologist, Dr. Cornell, and two attorneys, Boone and Cooley, as expert witnesses. Beaver does not complain that he was prevented from calling any witnesses. There was no undue limit on the cross-examination of any witness called by the Commonwealth, and both Maclin and Rainey testified and were cross-examined at length. Even now, Beaver does not claim that his cross-examination of Maclin and Rainey in the state habeas proceeding was unduly limited, if limited at all. There is no indication the state habeas hearing was not full and fair, and we hold that it was.

■ The record does not disclose any sought-for procedural consideration the state habeas court should reasonably have extended to Beaver and did not. We thus hold that this assignment of error is without merit.

### IV.

We next consider Beaver's claim that Virginia's capital murder statute is unconstitutionally vague because of a claimed conflict between § 19.2–264.2, which Beaver argues restricts the evidence of future dangerousness to the defendant's past criminal record of convictions, and § 19.2–264.4, which has been construed to permit the introduction of evidence of alleged crimes for which the defendant has neither been charged nor convicted. The argument goes that any such conflict makes it impossible for a defendant to know what kind of evidence can be used against him.[5]

---

5. There is no claim here that Beaver did not have notice of the introduction of evidence with respect to an incident of his robbery of his stepfather, of which he had not been convicted. Apparently, the claim is that the statute is so facially vague as to be unconstitutionally invalid.

His attorneys knew about the robbery of his step-father and discussed the matter prior to the trial. JA 745–746. The only allusion to any state of affairs which might border on a misrepresentation claim concerns the construction of the plea agreement which has been thoroughly and

This argument was rejected by the Virginia Supreme Court in *LeVasseur v. Commonwealth*, 225 Va. 564, 304 S.E.2d 644 (1983), *cert. denied*, 464 U.S. 1063, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984). See also *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Smith v. Commonwealth*, 219 Va. 455, 248 S.E.2d 135 (1978), *cert. denied*, 441 U.S. 967, 99 S.Ct. 2419, 60 L.Ed.2d 1074 (1979). We rejected this same claim in *Peterson v. Murray*, 904 F.2d 882, 885 n. 4 (4th Cir.), *cert. denied*, 498 U.S. 992, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990). We decline to reconsider the matter here and decide that the claim is without merit.

## V.

### A.

■ To prevail on a claim of conflict of interest, Beaver must present convincing evidence of an actual conflict and a resulting adverse effect on performance. *Sumner v. Mata*, 449 U.S. 539, 550, 101 S.Ct. 764, 770–71, 66 L.Ed.2d 722 (1981); *Cuyler v. Sullivan*, 446 U.S. 335, 345–58, 100 S.Ct. 1708, 1716–23, 64 L.Ed.2d 333 (1980).

As evidence of actual conflict, Beaver points to Rainey's testimony at the state habeas hearing that from time to time he represented the Commonwealth in grand jury proceedings and criminal prosecutions and that he wrote most of the briefs submitted for appeal of criminal cases by the Commonwealth's attorney. Beaver also points to Rainey's testimony that in his duties as assistant attorney for the Commonwealth in Dinwiddie County, he had a professional working relationship with law-enforcement officers, including Virginia State Troopers, and that the officers would on occasion help investigate cases and testify on behalf of the Commonwealth.

The state habeas court found that prior to and during the time of his representation of Beaver, Rainey's duties as an assistant Commonwealth's attorney for Dinwiddie County were limited in both nature and number.

This was based on Rainey's testimony that he had tried only a handful of felony cases during his employment for the Commonwealth between 1978 and 1985 and that he was not required to regularly appear in the courts in Dinwiddie County with the exception of juvenile court in Petersburg. The court also found that based on his position with the Commonwealth, Rainey had no working relationship with any of the witnesses at Beaver's trial, no regular relationship with state troopers, and no regular working relationship with the physicians from Central State Hospital. The court found that Beaver had presented no evidence that Rainey's conduct of the defense was altered in any way by his status as a part-time assistant Commonwealth attorney in Dinwiddie County. On its finding that the record of the trial and the evidence presented at the habeas hearing supported the Commonwealth's proposed findings of fact and conclusions of law, the court adopted and incorporated the Commonwealth's findings of fact into its order of July 8, 1992. The court concluded that the findings of fact did not support Beaver's allegations that Rainey's employment by the Commonwealth violated his Sixth Amendment right to counsel free from conflict of interest which adversely affected Rainey's defense.

Applying the presumption of correctness to the state habeas court's findings of historical fact according to § 2254(d), the district court affirmed the state habeas court's determination that there was no actual conflict in Rainey's representation of Beaver.

■ We are also of opinion that the factual findings of the state habeas court are supported by the record and are entitled to a presumption of correctness under § 2254(d). The present objections to them have been considered in part III above and held to be without merit.[6] We thus conclude that Bea-

---

factually explored by the state habeas court, as well as by the district court and by us in Part VI of this opinion. Cf. *Gray v. Netherland*, —— U.S. ——, —— ————, 116 S.Ct. 2074, 2081–83, 135 L.Ed.2d 457 (1996).

6. The extent of Rainey's work for the Commonwealth was explored on cross-examination of Rainey who testified that:

The way in our particular situation that the job was designated, it was very part time. One hundred dollars per month when I started.

ver has failed to show a conflict of interest of Rainey, and we affirm the district court's denial of habeas relief on this issue.[7]

### B.

■ Beaver also argues that the mere fact that Rainey was a part-time Commonwealth's attorney in neighboring Dinwiddie County established a *per se* conflict of interest which would disqualify him from representing Beaver and establish Beaver's claim of incompetence of counsel as a matter of law. The argument goes that the case of *Goodson v. Peyton*, 351 F.2d 905 (4th Cir.1965) established that rule. The district court held, however, that Beaver's sought-for construction of *Goodson* was too broad, and we agree.

*Goodson* was a case in which Goodson, the prisoner, had been convicted of escape in the Circuit Court of Powhatan County. On that charge he was represented by a court-appointed attorney who was the Commonwealth's Attorney for neighboring Cumberland County. We found that the record

revealed a very competent performance by defense counsel, and that Goodson had not suggested anything which might have been done for him in the state trial court which was not done, or anything that was done that should not have been done. We concluded that Goodson suffered no actual prejudice and held that Goodson was not entitled to relief because "there was no conflict." 351 F.2d at 909. We added a dictum, however, that it might well be that a "workable rule *for the future*" (italics added) would be a *per se* one in which it would be presumed that one so represented by a public prosecutor had not had a fair trial. The district court concluded, however, that the dictum with respect to the future established no *per se* rule, and again we agree.

■ In the case before us, the facts are indistinguishable from those in *Goodson*, and we come to the same conclusion. Because there is no conflict of interest in this case, Beaver is not entitled to relief.[8] Accord: *Jones v. Baker*, 406 F.2d 739 (10th Cir.1969).

When Mr. Elder wanted to take vacation, which might be two weeks of the year, I would cover for him on these two weeks, which might mean I would hold general district court twice, possibly one circuit court situation. If there were juvenile and domestic relations cases, specifically juvenile criminal cases where a detention hearing was being held in the City of Petersburg, he would call upon me to appear there on those rare occasions when that happened. I believe I appeared once, might have been more, before grand jury when Mr. Elder was out of town on seminar. My appearances were fairly limited in time. He occasionally would ask me to take a circuit court case so that I was getting some experience.... And I ended up writing most of the briefs he had to write to send on to the Supreme Court at that time. And that was the nature of my job.

7. Because Beaver has failed to show conflict of interest, we do not need to address Beaver's claim that he did not waive conflict of counsel. However, the state court's findings of fact that Rainey regularly informed all clients in criminal cases that he was an assistant prosecutor in Dinwiddie County, and that Beaver had knowledge of this and expressed no objection to Rainey's representation of him are supported by the record as well.

8. The Commonwealth takes the position that even if we adopted the position of Beaver, that the mere representation by a public prosecutor in a neighboring county deprives an accused of a

fair trial, the rule of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), would prevent its imposition, for a *per se* rule in these circumstances would be new and would first be applied in a collateral proceeding. Because we hold there has been no conflict of interest on the part of Rainey, and the sought-for *per se* rule is not the law, we do not reach the question of whether or not *Teague* would have any application.

We are further of opinion that a dictum in *Yates v. Peyton*, 378 F.2d 57 (4th Cir.1967) (per curiam), referring to a *per se* rule in *Goodson* referred only to the dictum in *Goodson* we have mentioned above. As indicated in the body of this opinion, we hold there is no such *per se* rule in this circuit.

The mere fact that *Teague* has been pleaded as a bar to the consideration of a matter raised on collateral review does not require us to "engage in the threshold *Teague* inquiry in a case [as here] in which it is clear that the prisoner would not be entitled to the relief he seeks even if his case were pending on direct review." *Wright v. West*, 505 U.S. 277, 306, 309, 112 S.Ct. 2482, 2498, 2499, 120 L.Ed.2d 225 (1992) (Justice Kennedy concurring, citing *Collins v. Youngblood*, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990)).

Interestingly, the Commonwealth does not plead *Teague* as a bar to the consideration of the vagueness challenge to the statute discussed in Part IV above.

## VI.

Beaver next challenges the validity of his plea of guilty on the grounds that the plea was involuntary because not knowingly and intelligently made and because of ineffective assistance of counsel.

He argues that the agreement was ambiguous on its face and thus should be construed against the Commonwealth so as to justify his present position that the Commonwealth had agreed not to seek the death penalty or show evidence of future dangerousness at the sentencing hearing.

He next argues that a remark he made to his attorney during the sentencing hearing should have been communicated by his attorney to the court as an indication of his misunderstanding of the plea agreement and that not so doing made his attorney's representation ineffective.

The plea agreement contained the following passage which is that in contention:

The Commonwealth agrees not to argue sentence. The Commonwealth agrees to submit the issue of sentence to the court without comment.

Beaver argues that the language just quoted is ambiguous and that it may be construed to require that the Commonwealth offer no evidence with respect to sentencing or that the Commonwealth would not seek the death penalty.

■ Neither of these constructions of the plea agreement were put forth at trial or on direct appeal and the state habeas court decided the question was procedurally barred under the rule of *Slayton v. Parrigan*, 215 Va. 27, 205 S.E.2d 680 (1974), *cert. denied*, 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975). The district court held that that finding of default was an adequate and independent state law ground for refusing habeas corpus relief, and again we agree. *Coleman v. Thompson*, 501 U.S. 722, 729–30, 111 S.Ct. 2546, 2553–54, 115 L.Ed.2d 640 (1991).

Beaver next argues that the fact that he misunderstood the agreement was communicated to his attorney during the sentencing hearing, but his attorney took no action with respect to that claimed misunderstanding. The argument goes that this makes for ineffective counsel.

The evidence in the record to support this contention is the testimony of Maclin at the habeas hearing that some time during the sentencing hearing the following event took place:

Q: (By Mr. Harris, the attorney for the Commonwealth) Is it your recollection that this comment was made some time while the Commonwealth was presenting evidence?

A: It would have to be either presenting evidence or cross-examination.

Q: And the question that was given to you by your client was "Can they do this?"

A: Something to that effect.

Q: Did you have any response to him at that time.

A: I more than likely said, "Yes, it's pursuant to our agreement."

A. 624 [9]

Nothing more was said of the event until the matter of ineffective counsel was raised after the trial.

Upon the entry of Beaver's guilty plea, the following question and answer appeared in the record:

Q: (The Court) Do you understand that in exchange for your plea of guilty, the Commonwealth, through the Commonwealth's Attorney, agrees simply not to argue the issue of sentence and that the Commonwealth agrees to submit the issue of appropriate sentence to the court without argument or comment. That is the sum total of the Commonwealth's obligation to you under the terms of the negotiated plea agreement?

A: Yes, Sir.

A. 172

Just previously the following proceedings were had:

Q: (The Court) Under the second indictment to which you have plead [sp]

---

**9.** Beaver testified that he made the request to Rainey. The state habeas court found the request was made to Maclin.

guilty, that is the capital murder of a police officer for the purpose of interfering with the performance of his official duties, under that indictment, if the court finds you guilty under your plea or guilty and upon the evidence that the two permissible sentences are, one, death, and two, life in the penitentiary?

A: (Mr. Beaver) Yes, sir.

A. 171.

The state habeas court made the following findings of fact relevant to this issue:

1) Defense counsel fully explained the plea agreement to Beaver. JA 50, 168–69, 172, 626.

2) Beaver was fully aware of the meaning of argument and comment. JA 50, 172–73.

3) The Court does not believe Beaver's testimony [for example at JA 57–58] that he misunderstood the plea agreement or that he thought the Commonwealth was prevented from offering evidence. JA 50.

4) Beaver's pleas were made voluntarily and intelligently with a full understanding of the consequences of the pleas. JA 8, 50, 72, 168–73.

5) Beaver did not claim that his attorneys had told him that the plea agreement meant that the Commonwealth could not offer evidence to show his criminal history. JA 50–51, 364, 463.

6) Beaver admits that he did not pursue with his counsel any question that some evidence should have been excluded because of the plea agreement. JA 51, 460.

7) Beaver never advised his attorneys that he did not understand the plea agreement. JA 51, 460–62.

These findings of fact are supported by the record. Therefore, we affirm the finding of the district court that the statement of Beaver to Maclin alone was not sufficient to overcome the state habeas court's findings. Thus, we affirm the finding of the district court that Beaver did not misunderstand the terms of the plea agreement.

## VII.

Beaver's remaining claims of ineffective assistance of counsel deal with the investiga-

tion and presentation of evidence. Brief p. 43–48. Beaver first claims that his counsel failed to conduct adequate investigation of mitigation evidence and to present significant and helpful testimony from family members, and that they should not have relied on the reports of various social service agencies and probation officers in the record.

▮▮▮ A defense attorney has a duty to make reasonable investigation into mitigating factors. *Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984); *Barnes v. Thompson,* 58 F.3d 971, 979 (4th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 435, 133 L.Ed.2d 350, 64 U.S.L.W. 3377 (1995). However, an allegation of inadequate investigation does not warrant habeas relief absent a proffer of what favorable evidence or testimony would have been produced. *Bassette v. Thompson,* 915 F.2d 932, 940–41 (4th Cir.1990), *cert. denied,* 499 U.S. 982, 111 S.Ct. 1639, 113 L.Ed.2d 734 (1991).

Beaver now asserts that his father, Sandy Beaver, should have been called to testify about Beaver's obsession with his mother and that this testimony was important because it was his mother who encouraged and aided his involvement in drugs and petty crime. He also claims that his mother, May Lowers, should have been called to testify that she consumed drugs with her son, that she hid him when he ran away from rehabilitation programs, and that she was the one who planned the robbery of the Crossroads Inn owned by her ex-husband whom Beaver allegedly assaulted with a crowbar and knife during the robbery. Beaver also claims that his counsel asked his wife only about his drug abuse and failed to illicit testimony about other things she knew about, specifically his mother's influence on him and the Crossroads Inn robbery.

The state habeas court found that at the time of petitioner's trial, both Maclin and Rainey were capable attorneys, experienced in the practice of criminal law and in the trial of capital cases. This was based on documented experience in the representation of defendants charged with serious felonies, including murder. The court found that de-

fense counsel adequately investigated and presented mitigating evidence.

Rainey testified that the trial strategy for sentencing would be to show that Beaver was a troubled young man with many problems in terms of his upbringing. Rainey testified that the reports spoke well for what they were trying to argue, and that he was concerned about the prosecutor's ability to cross-examine and discredit testimony of the proposed witnesses. Rainey testified that it was his opinion that "the trier of fact gives some credibility to a document prepared by a third party, especially a document prepared by a court agency." Rainey stated that if the information "comes out of a court record . . . and the court has accepted it and [the prosecutor] hasn't raised any objection to it and we've made it part of the record, at least from a point of strategy, I believe it had a stronger basis, and we were going to get the final argument."

■ The record reveals that Rainey's concerns about the testimony of Beaver's mother as well as other family members were well-founded.[10] The evidence of Beaver's past that Beaver claims should have come from family members was before the court, and the court found Beaver's childhood and family relationships to be mitigating factors. We conclude that the decision to rely on the credibility of reports and documents from disinterested parties rather than risk that Beaver's father or mother or other family members might be discredited or testify adversely to Beaver's interests on cross-examination was reasonable trial strategy that was within the objective standard of reasonable effective assistance. *Burger v. Kemp*, 483 U.S. 776, 788–95, 107 S.Ct. 3114, 3122–26, 97 L.Ed.2d 638 (1987); *Bunch v. Thompson*, 949 F.2d 1354, 1363–64 (4th Cir.1991), *cert. denied*, 505 U.S. 1230, 112 S.Ct. 3056, 120 L.Ed.2d 922 (1992).

Beaver also asserts that his attorneys were ineffective because they called the Common-

wealth's expert witness, Dr. Dimitris, to testify on direct examination as to Beaver's future dangerousness, despite the fact that Dimitris had informed Rainey a week before trial that he could not offer evidence in Beaver's favor. Rainey testified at the state habeas hearing that he did not expect the testimony of Dr. Dimitris to be helpful, but he thought there were some brief points that might be favorable to Beaver.

The record indicates that Rainey's direct examination of Dr. Dimitris on July 9, 1985 was brief, asking Dr. Dimitris to give an opinion as an expert as to Beaver's future dangerousness as to committing homicide. Dr. Dimitris answered that "my opinion cannot be raised to the point of having medical certainty, so far in giving me insights, but not the basis to quote an opinion with reasonable medical certainty." On questioning from the court as to the broader question of the likelihood of future criminal conduct, Dr. Dimitris replied that it was his impression that Mr. Beaver had not profited from his experiences in the Second Genesis program. We think this testimony is, as his attorneys had hoped, more helpful to Beaver than harmful.

■ We conclude that the decision to call Dr. Dimitris was a reasonable tactical decision by counsel to control the presentation of evidence to diminish the force and effect of Dr. Dimitris' testimony and that this decision was within the standard of reasonably effective assistance of counsel.

Beaver also claims ineffective assistance because counsel failed to inform Beaver's psychiatric expert, Dr. Reddy, of Beaver's alleged assault on his stepfather (Jimmy Compher) and failed to "insure that . . . [Dr. Reddy] independently corroborated the information he received from Beaver," all of which, the argument goes, caused Dr. Reddy to lose credibility on cross-examination. The record indicates that Beaver's counsel sup-

---

**10.** Briefly, while Beaver's mother was present at the first day of the sentencing hearing and testified at the habeas hearing that she would have testified on behalf of her son, when she was interviewed by the probation officer preparing the presentence report, she denied using drugs or giving drugs to Beaver, which is in direct conflict with Beaver's present claims. Further, Sandy Beaver made no effort to see or communicate with his son from the time Beaver was arrested until after the sentencing when he made one visit to see Beaver in Mecklenburg. Beaver does not now suggest what his father could have added to the reports already before the court.

plied Dr. Reddy with the reports and records concerning Beaver's juvenile offenses and his convictions in Maryland prior to trial. Dr. Reddy stated that he had examined the records and that his opinion was based on the records as well as information supplied by Beaver. However, on cross-examination, Dr. Reddy testified that he was not aware of the robbery and assault on Jimmy Compher and that this information might influence his opinion as to Beaver's future violence to some degree if Beaver did not get treatment.

Beaver testified at his sentencing hearing that he was not involved in the Compher incident. He had told his attorneys that he was not involved in the Compher incident.

■ Beaver argues that his counsel and Dr. Reddy should have independently corroborated information that Beaver himself gave to his attorneys and upon which Dr. Reddy acted. Beaver later admitted in his state habeas hearing that he had lied to his attorneys. While trial counsel have a duty to the court not to present known perjured testimony, we know of no authority that required Beaver's counsel to insure Beaver's truthfulness to Dr. Reddy or themselves while engaged on his behalf. We hold there is no such obligation and are of opinion that this claim is frivolous.

Finally, Beaver claims that his attorneys failed "to recognize and introduce evidence from a psychiatric report demonstrating that Beaver was one of the *least likely* persons to pose a threat of violence ...." (italics are brief writer's). The argument is that such information was known and readily available to them but they completely failed to make effective use of it.

■ The brief fails to name which psychiatric report and refers only to pages in the appendix, and does not otherwise explain the nature of this conclusory claim. An examination of the record reveals that the claim is without foundation in fact.

Dr. Dimitris, a psychiatrist, had testified for the Commonwealth at the sentencing hearing that the Minnesota Multiphasic Personality Inventory had predicted that Mr. Beaver would explode.

Beaver's attorneys, at the state habeas hearing, had sought the help of a certain Dr. Cornell, a clinical psychologist. Dr. Cornell had gone over the transcript of the sentencing hearing with a view toward commenting on the effectiveness of Beaver's lawyers, with whom he disagreed, as he did with the conclusion of Dr. Dimitris, with whom he also disagreed, for he testified that the Megargee Typology, related to the Minnesota Inventory, when applied to this case, would indicate that Beaver would be less likely to be a risk of violent behavior than other criminal defendants because he was Type B, one of the least violent felons.[11] He testified this evidence was available to Mr. Beaver's counsel and that Mr. Beaver's counsel had not discussed it. Remembering that the fault which Beaver now seeks to lay on his lawyers was "failure to recognize" the significance of this Type B classification, we next show that the view of the record taken by Beaver and Dr. Cornell is quite misplaced.

The Second Genesis papers, which are a part of the record and were introduced by the Commonwealth at the sentencing hearing with respect to Beaver, show that:

> His profile matches that of the Megargee Typology Type B offender, a somewhat infrequently incarcerated type. These individuals tend to be more non-assertive, passive and constricted than most convicted felons and tend to deceive themselves about the severity of their problems.

Beaver's lawyers obviously recognized the significance of Type B, perhaps from this very language, the meaning of which is apparent to anyone with an elementary knowledge of English. The lawyers were ready for the cross-examination of Dr. Lee, a clinical psychologist, who testified for the Commonwealth at the sentencing hearing. Dr. Lee testified that the Megargee Scales did show that Type B people tended to be more non-assertive, passive and constricted than most convicted felons. He, however, testified

---

11. Dr. Cornell also testified that Dr. Reddy, a psychiatrist who testified for Beaver, "would not have known that information."

that he did not entirely agree with the Megargee Scales and that, in his opinion, they gave only a 40% prediction.

Indeed, Beaver's lawyers in their closing argument included the following, to which the Commonwealth could not reply because of the plea agreement:

> Dr. Dimitris got into a discussion of the difference between a secured facility and one where a person would receive treatment without being in a prison setting. Also, Dr. Lee, in reviewing the Minnesota report, agreed with part of it and disagreed with part of it, the part being where he is a Type B offender, who would be non-assertive and passive; and the report itself in one part indicates that he would strike out or lash out. I would suggest that since no one has contradicted what Dr. Reddy has stated, that he is amenable to treatment; and there has been no valid prediction as to his future dangerousness or to his propensity to commit crimes. Thus, we see that not only did Beaver's lawyers recognize the significance of the Minnesota Inventory and Megargee Scales finding that Beaver was Type B, they cross-examined the Commonwealth's witness on the very subject and argued the same. We thus are of opinion that this contention is without foundation in fact and is without merit for that reason.

The judgment of the district court is accordingly

*AFFIRMED.*

K.K. HALL, Circuit Judge, dissenting:

At the heart of this case lies the relationship between a Virginia lawyer and two of his clients. Thomas O. Rainey III first undertook to represent the Commonwealth of Virginia in 1978 upon being hired as a part-time prosecuting attorney in Dinwiddie County. The professional affiliation between Rainey and the Commonwealth has continued, unbroken, to this day; Rainey was appointed as Dinwiddie County's chief prosecutor in 1986,

and has retained the post through several subsequent elections.

About a year prior to his promotion, Rainey accepted Gregory Warren Beaver as a client. Beaver had been accused of fatally shooting a Virginia state trooper during a traffic stop on Interstate 95. Beaver's accuser was none other than the Commonwealth of Virginia, yet Rainey saw nothing wrong with representing both clients simultaneously. Although the majority has placed its imprimatur upon this arrangement, I cannot lend mine.

### I.

To begin with, the majority misapprehends the test set forth in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), to determine whether a defense attorney's divided loyalties have deprived the accused of his Sixth Amendment right to counsel. The accused is not required to demonstrate, as the majority states, "an actual conflict *and* a resulting adverse effect on [counsel's] performance," *ante*, at 1192 (emphasis supplied). Rather, he need only "establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 350, 100 S.Ct. at 1719. Once the conflict is established, counsel is conclusively presumed to have rendered ineffective assistance as a matter of law:

> *Glasser [v. United States*, 315 U.S. 60, 76, 62 S.Ct. 457, 467–68, 86 L.Ed. 680 (1942)] established that unconstitutional multiple representation is never harmless error. Once the Court concluded that Glasser's lawyer had an actual conflict of interest, it refused "to indulge in nice calculations as to the amount of prejudice" attributable to the conflict. *The conflict itself* demonstrated a denial of the "right to have the effective assistance of counsel."

*Cuyler*, 446 U.S. at 349, 100 S.Ct. at 1719 (emphasis supplied).[1]

---

1. *Cf. United States v. Tatum*, 943 F.2d 370, 375–76 (4th Cir.1991):
   > An attorney has an actual conflict when he actively represents conflicting interests.... When the attorney is actively engaged in legal

   > representation which requires him to account to two masters, an actual conflict exists when it can be shown that he took action on behalf of one. The effect of his action *of necessity* will

## II.

As to whether there was an actual conflict in this case, the majority simply recites the state habeas court's conclusion that there was not, and it appears to characterize that conclusion as a "historical fact," entitled to the presumption of correctness accorded such findings by 28 U.S.C.A. § 2254(d) (West 1994). *Ante,* at 1195. This rubber-stamp approach contravenes *Cuyler,* which plainly states that the ultimate issue of whether a conflict of interest exists in a particular case "is a mixed determination of law and fact that requires the application of legal principles to the historical facts," *id.* at 342, 100 S.Ct. at 1715, and that does not, therefore, fall within the ambit of § 2254(d). *Id.* at 341, 100 S.Ct. at 1714.

It must be remembered that *Glasser, Cuyler,* and their progeny dealt only with the potential conflict of interest posed when a defense lawyer attempts to represent more than one defendant in the same or related criminal proceedings. Because the conflict posed by such scenarios is only a potential one, it is often necessary to delve into a myriad of historical facts involving the codefendants' competing interests and counsel's actual performance.

Requiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not *per se* violative of constitutional guarantees of effective assistance of counsel. This principle recognizes that in some cases multiple defendants can appropriately be represented by one attorney; indeed, in some cases, certain advantages might accrue from joint representation.

*Holloway v. Arkansas,* 435 U.S. 475, 482, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978).

Beaver's situation is wholly different, and far more egregious. Rainey did not simultaneously represent codefendants whose interests were merely potentially conflicting, but instead simultaneously represented the opposing party, whose interests, by definition, were diametrical to those of Beaver.[2] The dual nature of Rainey's representation is the only "historical fact" of which we need take note.

Applying established legal principles to that lone fact, I must conclude that a conflict of interest existed as a matter of law.[3]

Apparently, the only authority that can be cited to support the proposition that Virgi-

---

adversely affect the appropriate defense of the other.
(citation omitted) (emphasis supplied).

**2.** *See Zuck v. Alabama,* 588 F.2d 436, 439 (5th Cir.) (holding that an actual conflict existed where the law firm appointed to represent the defendant in a murder trial was also the prosecuting attorney's counsel in personal civil matters), *cert. denied,* 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979):

An actual conflict of interest occurs when a defense attorney places himself in a situation inherently conducive to divided loyalties.... If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interests of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to his other client.

(citation and quotation marks omitted). By simultaneously representing Beaver and the Com-

monwealth, Rainey could hardly take any action beneficial to one that would not also be detrimental to the other. The point is so elementary as to scarcely require explanation.

**3.** *See* Richard H. Underwood, *Part–Time Prosecutors and Conflicts of Interest: A Survey and Some Proposals,* 81 Ky. L.J. 1, 37 (1992): "In virtually every state there are ethics opinions stating that a part-time prosecutor may not defend in criminal cases—not just in the prosecutor's own county but anywhere else in his or her state. In some states the prohibition has been enacted into statutory law." (footnotes omitted). There is no statute or case law in Virginia that directly addresses the practice, but, according to that state's rules of legal ethics:

Maintaining the independence of professional judgment required of a lawyer precludes his acceptance or continuation of employment that will adversely affect his judgment on behalf of *or dilute his loyalty to* a client.

*Virginia Code of Professional Responsibility,* Canon 5; EC 5–14 (1996) (emphasis supplied).

nia's condonation of dual representation does not violate the Sixth Amendment is, unfortunately, our own opinion in *Goodson v. Peyton*, 351 F.2d 905 (4th Cir.1965). *See* discussion *ante*, at 1193.

In my view, *Goodson* was wrongly decided.[4] Therein, we fell victim to the same analytical flaw regarding *Glasser*'s application that afflicts the majority here in applying *Cuyler*. Quite simply, we failed to note the fundamental difference between representing several defendants against the state, and representing a defendant and the state simultaneously. Hence, we proceeded, as the majority does today, to analyze the scope of counsel's prosecutorial duties and to dissect his performance, searching for possible prejudice to the defendant. *See Goodson*, 351 F.2d at 908–09. Because we found no "actual" prejudice, we found no conflict.[5]

That line of reasoning impermissibly puts the cart before the horse. Our adversary system of justice inevitably engenders conflict. The opposing parties to a dispute are immutably in conflict, and there is, therefore, no clearer conflict of interest than when a lawyer undertakes to represent both sides. As the Supreme Court has repeatedly told us, once the conflict is established, the prejudice is conclusively presumed. Though the act that Beaver is accused of committing is a particularly evil one, he should not be compelled to face that most final of judgments

4. Regardless of the wisdom of its holding, *Goodson* would, of course, bind subsequent panels of this court. *See, e.g., Busby v. Crown Supply, Inc.*, 896 F.2d 833, 840–41 (4th Cir.1990). However, I believe that *Goodson* was effectively overruled by *Cuyler*. The Court in *Cuyler* reaffirmed and clarified *Glasser*'s dictate that the question of conflict is paramount to that of actual performance. *See Cuyler*, 446 U.S. at 350, 100 S.Ct. at 1719 (counsel's active representation of conflicting interests establishes the constitutional predicate for a claim of ineffective assistance). *Cuyler* thus sapped *Goodson* of any vitality it may once have had.

5. The relatively simple character of the charge in *Goodson* (escape) appears to also have influenced our decision in that case. *Id.* at 909–10. The capital murder charge against Beaver is, obviously, a far more serious and complex one, belying the majority's assertion that "the facts [here] are indistinguishable from those in *Goodson*. ..." *Ante*, at 1193.

without ever having had the assistance of a lawyer whose loyalty is beyond question.

I dissent.

We also took pains in *Goodson* to limit its prospective application: "[W]e think it may well be that the only workable rule of the future will be a per se one...." *Id.* at 909. A few years later, another court of appeals, in holding that the appointment of a part-time magistrate as counsel did not amount to a *per se* conflict, observed that "[t]he Fourth Circuit has reached a similar result in *Goodson* ... *under circumstances considerably more disturbing than we here consider* . ... [We] join in [its] caution that the practice should not persist." *Jones v. Baker*, 406 F.2d 739, 740 (10th Cir.1969) (emphasis supplied).

It follows from the preceding discussion, along with that in note 4, *supra*, that I would not hold Beaver's conflict-of-interest claim to be barred by *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *See ante*, at 1193–94 n. 8. Likewise, even if the conflict present in this case were one capable of being waived, I would not hold Beaver's mere acquiescence in Rainey's representation to have been an effective waiver. *See ante*, at 1193, n. 7.