FILED:  November 12, 1996

PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 95-4003

GREGORY WARREN BEAVER,

Petitioner - Appellant,

versus

J. D. NETHERLAND, WARDEN,

Respondent - Appellee.

AMENDED ORDER

We have before us a motion for a stay of the execution of Beaver which has been set for December 3, 1996, and as well a motion to extend our previously entered stay of our mandate.

It is ADJUDGED and ORDERED that the previously ordered stay of our mandate be extended until November 29, 1996, on which date our mandate will issue.

It is further ORDERED that the motion to stay the execution of Beaver, which has been set for December 3, 1996, shall be, and the same hereby is, denied.

Judge Widener concurs in all of the foregoing order.  Judge Hall agrees to the extension of the issuance of our mandate, but dissents from the denial of the stay of execution.  Judge Luttig

concurs in the denial of the stay of execution, but dissents from the stay of our mandate.

The opinion of the panel is delivered by Judge Widener; Judge Hall filed a concurring the dissenting opinion; and Judge Luttig filed a concurring and dissenting opinion.  All of those opinions follow.

_____
UNITED STATES CIRCUIT JUDGE
For the Court


WIDENER, Circuit Judge:

On September 30, 1996, we stayed our mandate in this case for a period of 30 days, to expire on October 30, 1996, "in order that . . . [Beaver] may file his petition for certiorari in the Supreme Court."

I refer to Fed. R. App. P. 41(b), which limits the usual stay of mandates to 30 days in such circumstances.

Beaver, on October 30, 1996, filed a motion to extend the stay of the mandate and for a stay of execution.

In Netherland v. Tuggle, 64 U.S.L.W. 3182 (1996), the Court required that in granting a stay of execution, we "undertake the three-part inquiry required by . . . [its] decision in Barefoot v. Estelle, 463 U.S. 880, 895-896 . . . (1983)."  The Court also cited us to Maggio v. Williams, 464 U. S. 46, 48 (1983) and Autry v. Estelle, 464 U.S. 1, 2-3 (1983).  The Court stated that "there is no hint that the court [of appeals] found that 'four Members of this Court would consider the underlying issue sufficiently

meritorious for the grant of certiorari' or that 'a significant possibility of reversal existed,'" citing <u>Barefoot</u>, at 895.

The three-part inquiry referred to in <u>Barefoot</u> is that "there must be a reasonable probability that four Members of the Court would consider the underlying issue sufficiently meritorious for the grant of certiorari or the notation of probable jurisdiction; there must be a significant possibility of reversal of the lower court's decision; <u>and</u> there must be a likelihood that irreparable harm will result if that decision is not stayed." <u>Barefoot</u>, at 895. (italics added)

The initial part of the rule with respect to four Justices grew from the practice of the Court in a Circuit Justice's in-chambers review of stay applications. See <u>Graves v. Barrens</u>, 405 U.S. 1201 (1972) (Justice Powell, Circuit Justice). It is there phrased as requiring that "there being a reasonable probability that four Members of the Court will consider the issue sufficiently meritorious to grant certiorari or to note probable jurisdiction." <u>Graves</u>, at 1203. The opinion referred to that principle as the "threshold consideration," and Justice Powell recited that he had utilized the practice of other Justices in passing on applications raising serious constitutional questions of "consulting with each of my Brethren who was available." He recited that all the Justices except two were available and that all who were available would have denied the application for a stay.

The second requirement of <u>Barefoot</u> is that "there must be a significant possibility of reversal of the lower court's decision," <u>Barefoot</u>, at p. 895, and the third requirement of <u>Barefoot</u> is that

"there must be a likelihood that irreparable harm will result if that decision is not stayed," <u>Barefoot</u>, at p. 895.

In cases involving the death penalty when an execution date has been set, as here, it is a certainty that irreparable harm will result if the court of appeals' decision is not stayed.

The rule, as stated in <u>Barefoot</u> is that four Members of the Court must consider the underlying issue sufficiently meritorious for the grant of certiorari and that a significant possibility of reversal exists. Until <u>Tuggle</u>, we were of opinion that the three-part <u>Barefoot</u> rule did not apply to courts of appeal considering whether or not to stay their own orders or to stay executions pursuant to their orders, but that the rule with respect to four Justices thinking a case was worthy of certiorari was only applied in the Supreme Court in its own consideration of applications for a stay. That is illustrated by <u>Autry v. Estelle</u>, 464 U.S. 1 (1983), which significantly was an opinion of the Court and not of a single Justice, and which opinion stated that

> Had applicant convinced four Members of the [Supreme] Court that certiorari would be granted on any of his claims, a stay would issue. But this is not the case; fewer than four Justices would grant certiorari. Applicant thus fails to satisfy one of the basic requirements for the issuance of a stay.

<u>Autry</u> at p. 2.

Of considerable significance is that in <u>Tuggle</u>, a significant possibility of reversal is not added to the fact that four Members of the Supreme Court should consider the underlying issue sufficiently meritorious for the grant of certiorari, rather the opinion states that "<u>or</u> that 'a significant possibility of a reversal' existed." (italics added) We do not believe that the

change from the serial requirement of <u>Barefoot</u> to the alternative requirement of <u>Tuggle</u> is inadvertent. Courts of appeal have no way of knowing or intelligently ascertaining the individual opinions of the Members of the Supreme Court, and I am not aware that this court, at least, has engaged in that speculation.

This leaves the question of whether there is a significant possibility of reversal. If there is, a stay should issue. If there is not, a stay should not issue.

The dissenting panel opinion of Judge Hall correctly describes the heart of the case as the relationship between Beaver's attorney and his client.

Beaver's attorney was a part-time attorney for the Commonwealth in a neighboring county. He argues that there should be a <u>per</u> <u>se</u> rule forbidding an attorney from representing a criminal defendant in one county if the attorney is a part-time attorney for the Commonwealth in a neighboring county. No actual conflict of interest was shown. As the dissent stated: "the dual nature of Rainey's [the attorney's] representation is the only 'historical fact' of which we need take note." If the <u>per</u> <u>se</u> rule espoused by the dissent is the correct rule, then Beaver may be due a new trial. If not, his execution should proceed.

To this I would add that in the case of <u>Angelone v. Bennett</u>, No. A-303, on November 4, 1996, the Court vacated our stay of execution in that case, which is our case No. 95-4004 styled <u>Bennett v. Angelone</u>. In that order, the Court made it clear that it did not approve of what had been a routine practice of this

court to extend in death penalty cases the time to file petitions for certiorari the same as in other cases.

On the off-chance that something we have done might hinder Beaver's filing of a petition for certiorari, we further extend the stay of the mandate in this case until November 29, 1996, but deny the motion for a stay of execution. Beaver's attorney forthwith should file his petition for certiorari and motion for a stay of execution and our mandate, any or all of them.

I cannot say that I believe there is a significant possibility that the Supreme Court will adopt the per se rule espoused by the dissent.

HALL, Circuit Judge, concurring in part and dissenting in part:

I join in the court's decision to extend the stay of our mandate though November 29, 1996, although I believe that our doing so is of little consequence. The district court's order denying the petitioner habeas relief remains in effect, even without our imprimatur; thus, there is currently no legal impediment to the Commonwealth's impending execution of the petitioner.

I respectfully dissent, however, from the majority's denial of the petitioner's motion to stay his execution pending his application for a writ of certiorari. As one may easily discern from reading the published opinions concerning the underlying matter, my views regarding the rule announced in Cuyler v. Sullivan, 446 U.S. 335 (1980), stand in stark contrast to those of the majority. I conclude that a reasonable probability exists that at least four Justices would vote to grant certiorari, inasmuch as the Court may be persuaded that, by agreeing to consider the merits of the petitioner's claim, it would have the opportunity to clarify its existing precedent.

And the merits of the petitioner's claim are substantial, perhaps even unusually so. There is, in my view, a significant possibility that Court will reverse our judgment in this case. Finally, there is no disputing the irreparable harm that will be done to the petitioner should his execution not be stayed. Because I believe that the three criteria of Barefoot v. Estelle, 463 U.S. 880, 895 (1983), have been met in this case, I would grant the petitioner's motion to stay his execution.

LUTTIG, Circuit Judge, concurring in part and dissenting in part:

I concur in the judgment that a stay of Beaver's scheduled execution is, under applicable Supreme Court caselaw, unauthorized. Were we to grant the stay of execution here, I believe that we would, alternatively, court summary reversal or affirmatively mislead the Supreme Court into concluding that we believe that the underlying issue in this case is certworthy when we do not so believe. I dissent from the court's further extension of our stay of mandate, however, because I believe that that extension is unauthorized as well.

In Netherland v. Tuggle, 116 S. Ct. 4 (1995) ("Tuggle I"), the Supreme Court summarily reversed our court's stays of execution and mandate which were entered pursuant to what had been our routine practice of granting such stays to unsuccessful capital petitioners, without regard to the requirements of Barefoot v. Estelle, 463 U.S. 880 (1983), while those petitioners sought certiorari review from the Supreme Court.[1] The Court admonished us for granting such stays "by summary order without opinion or discussion," observing that "[n]othing indicates that the Court of Appeals even attempted to undertake [the] three-part inquiry required by our decision in Barefoot v. Estelle." Tuggle I, 116 S. Ct. at 5. The Court reminded us, in language whose import is unmistakable, that it had, in Autry v. Estelle, 464 U.S. 1, 2-3

---

[1] Three weeks earlier, without discussion or citation to authority, we had instructed the Attorney General of Virginia not to "seek the setting of an execution date until the Supreme Court has ruled on the petition for writ of certiorari in the initial habeas corpus proceeding." Stockton v. Murray, No. 94-4000 (Aug. 21, 1995).

(1983), and Maggio v. Williams, 464 U.S. 46, 48 (1983), rejected the view that "a capital defendant as a matter of right [is] entitled to a stay of execution until he has filed a petition for certiorari in due course."  Tuggle I, 116 S. Ct. at 5.

With few, if any, exceptions, our court has continued routinely to grant stays in disregard of the Supreme Court's instruction in Tuggle I.  Initially, after our resort to the stay of execution was limited by that case, we did so through the vehicle of a stay of mandate.  Thus, in Tuggle v. Netherland, 94-4005 ("Tuggle II"), we summarily granted the defendant a stay of mandate, stating, in reasoning identical to that employed to justify our earlier stays of mandate and execution which were vacated, that our stay of mandate "serve[d] to stay Tuggle's execution until the final disposition of any timely-filed petition for certiorari in the Supreme Court."  (Likewise, in O'Dell v. Netherland, 94-4013(L), "by summary order without opinion or discussion," see Tuggle I, 116 S. Ct. at 5, we stayed our mandate in order to allow time for the filing of a petition for certiorari.)  When the Supreme Court finally corrected our mistaken belief that a stay of mandate operated as the functional equivalent of a stay of execution, see Netherland v. Tuggle, 116 S. Ct. 1821 (1996) (Rehnquist, C.J., Circuit Justice) ("Tuggle III"), we simply returned to our pre-Tuggle I practice of routinely granting stays of mandate and execution without analysis, having specially apprised counsel in numerous pending capital cases of their need to file motions for stay of execution separate from motions for stay

of mandate.[2]  Indeed, the very next day after <u>Tuggle III</u> was decided, we granted Tuggle himself a stay of execution without a single word of discussion or analysis of the <u>Barefoot</u> standards -- precisely what the Supreme Court held in <u>Tuggle I</u> that we could not do.  <u>See</u> <u>Tuggle</u> v. <u>Netherland</u>, 94-4005 ("<u>Tuggle IV</u>").

Our court's confusion, and consequent failure to abide by Supreme Court precedent regarding the proper standards governing stays of execution, persists to this day.  In his separate opinion, Judge Widener contends, notwithstanding the reaffirmation of <u>Barefoot</u> in <u>Tuggle I</u>, that <u>Tuggle I</u> itself modified <u>Barefoot</u> <u>sub silentio</u> so as to render <u>Barefoot</u>'s three-part test disjunctive. And, significantly, in a separate opinion entered today on the Supreme Court's remand following summary vacatur of our stay of execution in <u>Bennett</u> v. <u>Angelone</u>, a panel adopts Judge Widener's "revised" standard as binding precedent for our entire court.  <u>See</u> <u>Bennett</u> v. <u>Angelone</u>, 95-4004 slip op. at * (Nov. 8, 1996).

<u>Tuggle I</u>, of course, did not modify <u>Barefoot</u>, nor did it purport to do so.  In <u>Tuggle I</u>, the Supreme Court made the simple point that our court had not "even attempted to undertake the three-part inquiry required by . . . <u>Barefoot</u> v. <u>Estelle</u>."  116 S. Ct. at 5.  It then went on, in the very next sentence, to observe that "[t]here is no hint" that our court found either that four Members of the Supreme Court would grant <u>certiorari</u> or that a

_____

[2] <u>See</u> Letter of Oct. 14, 1996 from the Clerk to Counsel in Nos. 95-4003, <u>Beaver</u> v. <u>Thompson</u>; 95-4016, <u>Payne</u> v. <u>Netherland</u>; 95-4004, <u>Bennett</u> v. <u>Angelone</u>; 94-4013, <u>O'Dell</u> v. <u>Netherland</u>; 94-4005, <u>Tuggle</u> v. <u>Netherland</u>; 96-6, <u>Stewart</u> v. <u>Angelone</u>; 96-5, <u>Matthews</u> v. <u>Evatt</u>.

significant possibility of reversal existed.  The full passage

reads as follows:

> Nothing indicates that the Court of Appeals even
> attempted to undertake the three-part inquiry required by
> our decision in Barefoot v. Estelle.  There is no hint
> that the court found that "four Members of this Court
> would consider the underlying issue sufficiently
> meritorious for the grant of certiorari" or that "a
> significant possibility of reversal" existed.

116 S. Ct. at 5 (citations omitted).  From the Court's use of the

term "or," instead of "and," Judge Widener in this case and the

full panel in Bennett reason that Barefoot has been modified.

Quite obviously, the Court was not, by its passing observation,

summarily modifying its seminal opinion in Barefoot.  It was, by

way of explanation, merely emphasizing that we had analyzed neither

of the two requirements of Barefoot there in issue.  It could have

been clearer, I suppose; however, there was no reason to be so.  It

would never have occurred to the Court that its passage would be

misread as it has been today.

The confusion that will be generated by today's panel opinion

in Bennett v. Angelone is compounded by the fact that the panel

itself does not even apply the standard it adopts.  If, as the

panel opinion holds, the Barefoot standard is indeed a disjunctive

one, then the panel incorrectly confines its inquiry to whether

there exists a significant possibility of reversal; as well, the

panel should have considered whether, despite the unlikelihood of

reversal, four Members of the Supreme Court would nonetheless vote

to grant certiorari.  (The panel's contention notwithstanding, we

are in no better position to "know[] or intelligently ascertain[]

the individual opinions of the Members of the Supreme Court," ante

at 5, as to whether they might reverse our opinion, than we are to know or ascertain whether four of the Court's Members would vote to grant certiorari.)  Indeed, if the panel were correct, and the test now truly is disjunctive, then a stay would enter in every single capital case because Barefoot's first requirement of "irreparable harm" would always be met.

Here, Beaver asks us to stay both our mandate and his execution, as we have routinely done in the past for others similarly situated.  Despite what has been our general confusion, the court is entirely correct to deny the latter as unauthorized by Supreme Court precedent.  Indeed, were we to grant the requested stay of execution, this case would be indistinguishable from the stay of execution entered by our court in Bennett v. Angelone, 95-4004, the case here relied upon by Beaver, which was summarily vacated by the Supreme Court only a few days ago on the authority of Tuggle I.  See Angelone v. Bennett, 1996 WL 635020.  Like the order of stay in Bennett, Beaver's requested stay of execution in the instant case is, simply, insupportable under Tuggle I.

Now eleven years ago, Gregory Warren Beaver was convicted of capital murder and sentenced to death for the murder of Virginia State Trooper Leo Whitt.  On August 22, 1996, we upheld Beaver's capital murder conviction and death sentence.  Beaver v. Thompson, 93 F.3d 1186, 1188 (4th Cir. 1996).  Not one member of the court requested a poll of the court on whether to rehear the case en banc, and, consequently, on September 19, 1996, Beaver's petition for rehearing and his petition for rehearing en banc were denied.  Beaver thereafter petitioned the court for a stay of mandate for 90

days "in order to prepare a meaningful Petition" for certiorari. Without any discussion or explanation, we granted Beaver's requested stay of mandate for 30 days under F.R.A.P. 41(b), and the Commonwealth of Virginia subsequently scheduled Beaver's execution for December 3, 1996 -- over 100 days after we upheld Beaver's conviction and sentence. Not until the late afternoon of October 30, the date that our mandate was to have issued under the extended deadline, did Beaver approach this court with this successive motion for further delay of mandate and a new motion for stay of execution.

The Supreme Court's cases "make clear that a Court of Appeals should grant a stay [of execution] (to permit application for a writ of certiorari) only in a special case -- a case presenting a significant likelihood of [a] grant [of certiorari]." Angelone v. Bennett, 1996 WL 635020 (Breyer, J., dissenting) (citing Tuggle I, 116 S. Ct. 4). Obviously, this is not such an extraordinary case.

The Court is all but certain to deny certiorari on Beaver's legal claim that our interpretation of Cuyler v. Sullivan, 446 U.S. 335 (1980), is in error. The Supreme Court held in Cuyler that,

> [i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.

446 U.S. at 348 (emphasis added). In our opinion that Beaver proposes to challenge, we interpret this plain language to require that Beaver show an "actual conflict" and an "adverse affect." Beaver, 93 F.3d at 1192. Although the dissenting opinion is susceptible to different interpretations, even the dissent appears to agree that this is the proper standard; as it says, Beaver "need

only `establish that an actual conflict of interest adversely affected his lawyer's performance.'"  93 F.3d at 1198 (quoting Cuyler, 446 U.S. at 350).

To the extent that Beaver argues (and the dissent intended to suggest) that no adverse effect on the lawyer's performance need be shown, that argument is possible only through a selective quotation from the Court's opinion in Cuyler on which the dissent purported to rely.  The dissent and Beaver quote the Court in Cuyler as follows:

> Glasser [v. United States, 315 U.S. 60, 76 (1942)] established that unconstitutional multiple representation is never harmless error.  Once the Court concluded that Glasser's lawyer had an actual conflict of interest, it refused "to indulge in nice calculations as to the amount of prejudice" attributable to the conflict.  The conflict itself demonstrated a denial of the "right to have the effective assistance of counsel."

93 F.3d at 1198 (citation omitted).  The very next sentence in the Supreme Court's opinion, which both the dissent and Beaver omit, however, reads:

> Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief.

Cuyler, 446 U.S. at 349-50.  From this omitted sentence, it is plain that the Court was not relieving a petitioner of his burden of showing that a conflict adversely affected his lawyer's performance in some way, see, e.g., 446 U.S. at 349 ("Since Dukes did not identify an actual lapse in representation, we affirmed the denial of habeas corpus relief."), but only of any burden of showing that prejudice resulted from that effected performance.

In short, Beaver's argument, which quite obviously conflates the "adverse effect" and "prejudice" prongs of the inquiry under

Cuyler, cannot be reconciled with either the express language of Cuyler or the Court's other Sixth Amendment ineffective assistance of counsel authorities. Contrary to Judge Hall's suggestion, no "clarification" of Cuyler is needed.

The subsidiary question of whether Beaver's counsel's performance was in fact affected by any conflict is, of course, a routine, highly fact-specific inquiry, and here, at any rate, there is no evidence at all that counsel's performance was in any way adversely affected. Thus, this question is likewise unworthy (as a predictive matter) of Supreme Court review, its resolution ultimately having little or no impact beyond the facts of this particular case.

For these reasons, I concur in the court's denial of Beaver's motion for stay of execution.

Even though, as Judge Hall notes, it is "of little consequence," I would also deny the motion for an extension of the stay of our mandate. Only several weeks ago, we denied Beaver's motion for a stay of mandate beyond the 30 days contemplated by F.R.A.P. 41(b), which provides that a "stay [of mandate] cannot exceed 30 days unless the period is extended for cause shown." Absolutely nothing has changed in the intervening weeks since we denied that motion. There was no "cause" for staying our mandate for the requested time period then, and there is none today.

It seems clear to me that, when all is said and done, Beaver's counsel is engaged in the rather transparent and oft-repeated effort to delay Beaver's execution as long as possible through

seriatim motions -- without regard to the processes of either this court or the Supreme Court.